Bouldin, J.,
delivered the opinion of the court.
Bouldin, J. This is an appeal from a decree of the Circuit court of Bedford county, rendered on the 5th day of October 1868, in two suits in said court pending, and presents for our consideration questions growing out of the various and multiform transactions in Confederate States treasury notes during the late war.
The first of the two suits was a proceeding in chancery by H. C. Dickinson, trustee, to subject to sale certain property conveyed by the grantor, Quarles, to secure the paymeat of debts as therein mentioned; and on the 4th day of May 1860 a decree was entered ordering the sale of the property and appointing the appellee, H. C. Dickinson, a special commissioner to make it, on terms set forth in the decree. On the 4th of August thereafter the sale of the tract of land, which is the main subject of controversy, was made by the commissioner, and the appellant, Mead, became the purchaser. He promptly complied with the terms of sale, paying in cash the sum of $2,665.58J, being one-fourth of the purchase money; and for the residue executed his three bonds with security, payable in one, two and three years *350 in equal instalments, -with iuterest from the day of sale. The commissioner reported this sale to the court on the 26th day of September 1860; and on the 2d day of October 1860 a decree was entered confirming the sale and ordering Commissioner Dickinson to withdraw the bonds and collect the same as they should fall due. The first bond did not fall due until the 4th day of August 1861, when the war was raging between the United States and the Confederate States of America. Both Dickinson, the commissioner, and Mead, the purchaser, were then in the army of the Confederate States; and whilst Mead seems to have been ready and anxious to discharge this bond, Dickinson, owing to the unsettled condition of the country and currency and to his being in the army, was unwilling and declined to receive payment. Matters remained in this condition until October the 4th 1862, when Mead, who was still in the army, through his friend and surety, Crenshaw, applied to the court, the real creditor, for instructions; and the following order was entered in the cause:
“It being represented to the court that Oliver O. Mead, the purchaser of the tract of land in the bill mentioned, is ready to make payment of his first bond for the purchase money, and the commissioner appointed to collect the same now being in the army of the Confederate States, payment thereof cannot be made to him, the court doth adjudge, order and decree, that the said Oliver G. Mead do deposit in the Bedford Savings Bank at Liberty the principal and interest of said bond to the credit of this suit, and take a certificate of deposit therefor and file it with the papers in this cause. And the said Oliver G. Mead is at liberty in like manner to deposit in the Bedford Savings Bank at Liberty such other sums of money as he may deem proper, in payment of his second bond, due the 4th day of August *351 1862, taking like certificate of deposit therefor and filing them with the papers in this cause.”
On the third of October eighteen hundred and sixty-two, the day before the date of the above order, as it appears in the record, Mead deposited the amount of the first bond and interest ($3,011.25) in the Bedford Savings Bank, to the credit of the cause, as required by the order; andón 35 th of the same month filed a certificate of the deposit among the papers in the cause. The discrepancy in date is immaterial, and we think may readily be explained by supposing that the order was in fact announced and complied with on the 3d of October, but not formally entered on the order-book until the 4th.
At the date of this order, the intelligent and able judge who entered it, and the learned counsel in the cause, all knew, as matter of public history to be judicially noticed, that the common and almost the only currency in Virginia was Confederate States treasury notes; and Mead had a right to regard himself as authorized and ordered to pay in that curreucy, as he did pay.
Very soon thereafter, to wit: on the 12th of December 1862, Mead deposited in the Bedford Savings Bank, to the credit of the cause under the same order, the further sum of $3,041.13, amount of second bond and interest, and filed a certificate therefor among the papers in the cause. The clerk certifies that the certificate was filed on the “9th,” of December; but this is evidently a mistake for “19th,” as the deposit was not made until the twelfth. Both deposits were made in •Confederate States treasury notes, the certificate for the latter showing that fact on its face; and the certificates remained thereafter on file with the papers in the cause.
The last bond for the purchase money of the land fell due August 4th, 1863, and Commissioner Dickinson hap *352 pening to be at home at that time and finding that the purchaser, Mead, under an order of court in the cause, had been authorized to pay the two first bonds into the Bedford Savings Bank, and had in fact paid them in Confederate States treasury notes, deemed it his duty te act in conformity with the action of the court, and bn the 7th day of August 1863 collected the amount of the last bond in the same currency, and deposited it in the-same bank.
The bond fell due, as we have seen, on the 4th of August 1863 — not on the 6th, as inadvertently stated in the commissioner’s report; and on the 7th of the same month, as we have seeu, he collected the amount due, principal and interest, $3,145.81, and deposited it in bank as aforesaid. On the same day he made report of this collection and deposit, and filed his report among the-papers of the cause. There is no memorandum of the' clerk of the time of filing; but Dickinson swears, in his-answer, that it was immediately filed, and, from his-prompt and conscientious action throughout the cause, we have no doubt that such was the fact. This report states “ that all the purchase money of said land is now paid, the amount of two bonds having been deposited in. bank during last year under a special order.”
The next time we hear from Commissioner Dickinson-was on the 19th of March 1864, when he appears to have-been again at home. On that day he presented to JudgeWingfield a petition, giving the previous history of the case somewhat in detail, setting forth the sale above referred to, the purchase by Mead, the confirmation of the-sale, and the order to the petitioner-to withdraw and. and collect the bonds, the absence of the petitioner in the army, and tbe payment by Mead into bank of the-amount of the two first bonds in Confederate States treasury notes, under an order of the court in the cause, *353 and the subsequent collection by the petitioner of the last bond in like currency, and the deposit thereof in the same bank to the credit of the cause.
The petitioner further states, that since that time he had, as commissioner, collected from another source, A. M. Lowry, the further sum of $1,096.66, Confederate States treasury notes, and had made a like deposit thereof. These deposits were made under the impression that it was so ordered by the court; as to which he had discovered he was mistaken; misled, doubtless, by the order requiring Mead, the purchaser, to make deposits in that bank.
The petitioner calls the attention of the court to the fact that the fund does not bear interest, the bank being unwilling to pay it; that the respective interests of the parties in the fund had not been ascertained; and prays that the commissioner be allowed, “ by an order of this court,” to withdraw the fund from bank, and invest it “ in Confederate four per cent bonds, or in such other manner as the court may direct.” This was presented to the Judge, -we presume, in vacation, but evidently was, and was intended to be, a petition and report in the cause, as it was only by a decree or order in' the cause that the funds to the credit of the court in that cause could be withdrawn and otherwise invested. The judge, however, seemed to treat it as an exparte application, under the then recent act of assembly, and made thereon the following endorsement: “ I do not think this case comes within the purview of the act of assembly authorizing the investment of funds by fiduciaries. The petition, is, therefore, denied.”
“ March 18, 1864. G. A. Wingfielf.
The petition was on the same day filed by the commissioner with the papers in the cause, and we think *354 properly; being in substance and effect a report from, him, and an application to the equitable jurisdiction of the court to preserve and improve the fund under its control. Having thus, as he supposed, discharged his whole duty as commissioner, and having called the attention of the judge specially to the condition of the fund, he left it where it belonged, to the future control of the court. In all this the commissioner seems to have acted with marked propriety and good faith ; and indeed to have fulfilled the full measure of his duty, in his effort to call the attention of court, counsel and parties to the condition of the fund under the previous order of the court, and the propriety of preserving and impi’oving it. Heither court, counsel nor parties, how-over, seemed to heed the suggestion, being satisfied, ■doubtless, to let the fund remain where it was; and the same being no longer under the commissioner’s control, he of course had nothing more to do with it, and returned to his post in the Confederate army.
In this state of things the Circuit court, with the facts set forth in the petition aforesaid, recently and clearly presented to the mind of the judge, and with the reports and papers showing those facts all on file in the cause, entered on the 28th day of April 1864, the following decree, all parties being then before the court, viz:
“Thomas H. Nelson and Tandy K. Jones, two of the ■defendants, having departed this life,” (being, we would remark, the first suggestion of their death), “ by consent this cause is revived in the name of William L. Cog-gin, administrator of Thomas H. Nelson, deceased, and Isabella Jones, administratrix of Tandy K. Jones, deceased; and thereupon, this day this cause came on again to be heard on the papers formerly read, and the report of Henry C. Dickinson, the commissioner, to *355 collect the purchase money for the tract of land in the bill and proceedings mentioned; to which report there is no exception, and was argued by counsel. Upon consideration whereof the court, approving said report, doth confirm it. And it appearing by said report, that all the purchase money for the said tract of land purchased by Oliver G. Mead, has been paid, the court doth adjudge, order and decree, that Rowland D. Buford, who is hereby appointed a commissioner for that purpose, do convey to Oliver G. Mead, the purchaser, by proper deed for that purpose, with special warranty, at the costs of said Mead, the said tract of land containing four hundred and seven acres, two roods and thirty-eight poles, describing the same by metes and boundaries as set forth in the paper filed with the complainants’ bill, as Exhibit A.” And the court further ordered certain accounts preliminary to the distribution of the fund.
How, it will be observed, that when this decree was entered, finally disposing of all questions as to the sale of the land to Mead, the collection of the purchase money, and the conveyance of the land to the purchaser, all the parties were before the court, and the attention of the personal representatives of T. H. Edison and T. TT- Jones, or their counsel, must have been directly drawn to the terms and character of the decree, for their consent was required to mature the cause for a hearing; and we are justified in saying that they must have understood it. One of those representatives, Mr. William L. Goggin, was himself an experienced lawyer and a gentleman of State reputation; and we must presume that he and the other, parties to the cause knew what they were doing when they consented, with full knowledge of the facts, that the cause should be matured; and when, without exception to any thing that had been *356 ■ done, they allowed the commissioner’s report to be confirmed, and a conveyance to the purchaser to be ordered. That conveyance was in fact made on the 8th day of •July 1864, and duly recorded on the-same day, without objection by any one; and Mead certainly had some right to suppose, under such circumstances, that his title was good, and that he was no longer interested in the proceedings. The subsequent proceedings in the original cause were solely in reference to the distribution of the fund, except an answer filed in May 1866 by the same 'William L. Goggin, as administrator of Thomas H. bfelson, who, in April 1864, had, in efiect, assented to the confirmation of the commissioner’s report, and the conveyance to Mead, by not excepting thereto. In his answer, in 1866, when the fund had perished in the hands of the coui’t, he claimed, for the first time, that the collection in Confederate money should be disregarded. But, of this claim, Mead, who was no party to the suit, does not appear to have had notice; nor was his title ever assailed until the second suit above mentioned was instituted on the 10th of July 1867; nearly four years after the last payment made by him for his land, three years, two months and ten days after the court had decreed him a conveyance, and three years and two days after the conveyance was executed and recorded. This second bill was filed by certain persons claiming to be creditors of Quarles, and interested in the trust fund aforesaid, viz: Thomas M. Jones and others, every one of whom were parties to the first suit, and before the court, when the decree of the 28th of April 1864 confirming commissioner Dickinson’s report of collections, and ordering a conveyance to Mead, was entered.
They sought to set aside that decree, to obtain from Mead a second payment of the money paid by him on his bonds, and to hold Dickinson responsible for any *357 deficiency to the extent of his collections from Mead. Their claim to set aside the proceedings was based on three grounds:
1st. That Confederate States treasury notes were not money, and constituted no payment.
2d. That the order of the 4th of October 1862, authorizing Mead to pay the amount of his two first bonds in bank to the ci'edit of the cause, was made after the death of Thomas H. Nelson and Tandy K. Jones, and before their representatives were before the court, and was ex parte and void.
3d. That the report of Commissioner Dickinson, of the 7th of August 1863, in which he reports that the purchase money for the land had all been paid, a portion to himself and the residue by deposit in bank by Mead, the purchaser, was calculated to mislead the court; because it did not state in totidem verbis, that the entire collection of the three bonds was made in Confederate States treasury notes.
These were the grounds mainly relied on to impeach the decree of April 28th, 1864; and all that was offered to sustain them was what appeared on the record in the first suit, as above set forth. There was no charge nor any attempt to prove, fraud or bad faith on the part of either Mead or Dickinson. On the contrary, in speaking of the latter, they say in the bill “ they believe him incapable thereof;” yet, in the absence of any such allegation or proof, and in the face of the advice and approval of the court itself, as above set forth, the Circuit court, by the decree of the 5th day of October, 1868, entered in the two causes heard together, set aside and annulled as ex parte and void, the order of the 4th day of October 1862, authorizing Mead to pay into bank to the credit of the cause, the amount of his two first bonds: set aside the decree of the 28th of April 1864, *358 confirming Commissioner Dickinson’s report of the collections from Mead, and ordering a conveyance to him of the land purchased: decreed the deed made to him to be void: required Mead to produce and file again with the papers, the three bonds which he had already paid, and without allowing him any credit for the money or its value which had bee n paid into bank by him to the credit of the cause, under an order of the court, and had been allowed by the court itself and the parties to perish, ordered him to pay, within six months, the entire amount of the three bonds (less the gold value of $3,145.81, Confederate States treasury notes, collected by Dickinson), amounting in the aggregate to the sum of $11,485.96, with interest on the principal; and in default of such payment, ordered the land to be resold.
By the same decree Commissioner Dickinson was held responsible for, and decreed to pay the gold value of all Confederate States treasury notes received by him. From this decree Mead appealed to this court; and Dickinson has assigned errors also, under the rule of the court.
Ve have been more minute in stating the proceedings in these causes than might be necessary, because the rights of the parties depend on a correct understanding of those proceedings; and because we think a fair presentation of the facts is all that is necessary to bring the case directly within the influence of the principles established by this court in the cases of Davis v. Harman, 21 Gratt., 194; Dixon, &c.,v. Mc Cue's administratrix, Id. 373, and Walker's ex'or v. Page & als., Id. 636; and other cases which have followed them. Both purchaser and commissioner in these cases seem to have acted throughout, with abundant good faith — uberima fide— and all their acts in relation to the subject of controversy *359 were either prompted, or ordered, or fully and deliberately approved by the Circuit court. It is true that there are allegations in the bill in the second suit, and suggestions by the Circuit court in the decree appealed from, that there was ambiguity in the commissioner’s report of collections in not stating in terms, that these collections had been made in Confederate States treasury notes, and that the decree confirming it was improvidently made. The court says, that “the order made in said cause on the 28th of April 1864, based upon the report of the receiver, Henry C. Dickinson, that the purchase money owing by the said Mead had all been paid, which report was made upon the supposition that the payments in Confederate States treasury notes were good and valid payments, was improvidently made upon the statement in said report, ‘that all the purchase money had been paid,’ when in fact nothing but Confederate States treasury notes had passed from the said Mead to the Bedford Savings Bank, or to said Dickinson, as receiver; and the court doth therefore adjudge, order and decree,” &c.
We cannot regard the reasons thus suggested by the learned judge of the Circuit court, as sufficient grounds to set aside a decree so deliberately made and so long acquiesced in. Whatever doubts and perplexities as to the character of Confederate States treasury notes and the validity of proper payments therein, may have attended the administration of justice at an early period after the close of the late war with the United States, there cannot, at this day, be a doubt that they constituted a valid consideration; and that transactions therein closed in good faith during the war by parties understanding them and competent to contract, will not be reopened by this court, because they were based on Confederate States treasury notes. Hale v. Wilkinson, 21 *360 Gratt. 75; Ambrouse’s heirs v. Keller, 22d Id. 769; Staples v. Staples’ ex’or, decided at the November term. Supra, 225. The fact that the court and the parties did not, and could not know, at the time, what might thereafter be decided as to the character of such transactions, could not affect their legal validity.
Nor do we think there is any force in the suggestion in the decree, that Commissioner Dickinson had reported “that all the purchase money had been paid, when in fact nothing but Confederate States treasury notes had been paid.” That statement of the commissioner, we are well satisfied, misled no one; and we are bound to hold, from the facts appearing on this record, that the Circuit court knew, both judicially and in fact, and that all the parties knew, by counsel, when the decree of April 28th, 1864 was entered, confirming Commissioner Dickinson’s report of collections, and ordering a conveyance to Mead, that every dollar of Mead’s three bonds had been paid in Confederate States treasury notes. We say, judicially, because, when the court, by its order of October 4th, 1862, allowed and ordered Mead to pay the amount of his two first bonds into the Bedford Savings Bank, it knew judicially that Confederate States treasury notes constituted not only the general, but almost the only, currency in Virginia; and the plain and irresistible presumption was, that the payments were intended to be made, and would be made, in that currency; because, in obedience to the order of the court, the certificates of payment into bank were promptly filed by Mead among the papers in the cause; and there remained more than a year before the decree of confirmation, one of them showing on its face that it was payable in Confederate States treasury notes; and the court was bound to know judicially, what thus appeared by papers regularly filed, in the cause under its own order; and because the last *361 bond was collected by the commissioner as late as the 7th of August 1863, only three days after it fell due, and the collection reported, and report filed with the papers, on the same day. This report referred on its face to the deposit in bank made by Mead, under “ special order,” and remained with the papers more than eight months before its final confirmation. All this must be presumed to be known to the court; and'under such circumstances we are fully warranted in saying,- that on the 28 th day of April 1864, when Commissioner Dickinson’s report was confirmed, and a deed ordered to be made to Mead, the Circuit court judicially knew that every dollar of the purchase money secured by Mead’s bonds had been paid into court, or to the receiver of the court, in Confederate States treasury notes. But the court knew it also in point of fact; for it was plainly set forth in the petition and report of March 19th, 1864, which was read and examined by the judge, as appears by his own endorsement thereon, and which was on file when the decree of the 28th of April 1864 was rendered; and the parties, by counsel, must also be presumed to have known what thus plainly appeared by the record. There is nothing, therefore, in this objection.
Nor do we think there is more in the objection that at the date of the order of the 4th of October 1862, allowing Mead to pay the amount of his two first bonds into bank, Thomas H. Nelson and Tandy K. Jones were dead, and had no personal representatives before the court. The fact is not established in the cause. The ■death of those parties was not suggested until the 28th of April 1864, and there is no proof in the cause of the date of their respective deaths; and this court will make no presumption to operate an injustice, unless compelled so to do by some inflexible rule of law. But if the fact were as alleged, we are not prepared to say that the death *362 of a party to a suit in equity would suspend the equitable jurisdiction of the court to protect and preserve the fund under its control until the revival of the cause against the representative of the deceased. Such a result would be seriously inconvenient, and might, under some circumstances, prove disastrous to all concerned. But if such order be conceded to be irregular, it would not be void, but at most voidable only at the instance oftherepresentatives of the decedents; and we think in this case, by voluntarily appearing and consenting to the hearing without exception to the commissioner’s report, or any objection to the irregular order, and by actual acquiescence for years afterwards, these representatives have-lost all right they might have otherwise had to object thereto.
These objections aside, the case as to Mead, the purchaser, stands upon the facts above detailed: payment by him of one-fourth his purchase money in cash, and of the residue in the currency of the country at the time; the payments .ordered, approved and confirmed by the court; approved by the parties interested and acquiesced in for years; a deed made to the purchaser; the fund held for years exclusively under the control of the court for the benefit of creditors, and allowed by them to perish ultimately with no shadow of fault on the part of the purchaser. To make him under such circumstances, pay his money a second time, when it is impossible to restore him what he paid, we think would be manifestly unjust; and in conflict with the principles-established by this court in the cases we have cited. The language of Judge Staples in Dixon, &c., v. Mc Cue’s administratrix, &c., speaking for the whole court at p. 381, although applied in that case to the commissioner, would have been equally applicable to the purchaser, had the exigencies of the case, as here, called for its appli *363 cation to him. He says, “no objection was ever made to any of the proceedings; and now, after the loss of the fund by the disastrous termination of the war, it is sought to make the commissioner responsible for an act approved by the court, and never disapproved, so far as this record discloses, by the parties or their counsel. A rule of this sort adopted by this court would produce incalculable mischief throughout the State, and tend to the utter ruin of a vast number of innocent officers acting under the sanction and by the authority of the courts, during the protracted struggle in which the country was engaged. Every consideration of sound policy and justice requires that such officers should not be held responsible for acts bona fide performed under the direct approval and sanction of the court appointing them.” Every word thus quoted from Judge Staple’s opinion applies with equal force and propriety, mutatis mutandis, to the case of an innocent purchaser like Mead. The same principle rules both cases; for where it is lawful and proper to receive, it would seem necessarily to be equally lawful and proper to pay.
We are of opinion, therefore, that the Circuit court erred, to the prejudice of the appellant, Mead, in setting aside the order of the 4th of October 1862, and the decree of the 28th of April 1864, in the first cause, and in decreeing that he should pay the sum of $11,485.96, with interest on the principal, instead of dismissing the bill as to him, as it should have done.
And now as to the decree against Commissioner Dickinson. What has been held above as to Mead must necessarily lead to a reversal of the decree against Dickinson, so far, at least, as relates to collections from Mead. Eor all his acts in relation to that matter he had the deliberate sanction and approval of the court whose officer he was; the tacit approval and long acquiescence of all *364 the parties interested; and no complaint from any quarter until long after the fund had perished in the hands of the court, not by any fault or neglect of his, but when ■ it was beyond his control. To such a case the language of this court, through Judge Staples, above quoted, applies without a change of a word or letter. The case of' Davis v. Harman is also decisive of this question. It was error, therefore, to charge the appellee with the gold value of the Confederate States treasury notes collected from Mead. About the charge for the value of $1,096, Confederate States treasury notes, collected of A. M. Lowry, there is more doubt. This sum was collected under the same order under which the amount of Mead’s last bond was collected, but was received after that collection was reported to the court, and of course was not embraced in that report. It was promptly deposited, as were the other funds, in the Bedford Savings Bank, and the fact of collection and deposit was reported to the court in the petition and report of March 19, 1864, already referred to. That document remained on file among the papers in the cause down to the decree of April 28, 1864, and was before the court and the parties when that decree was entered; and although not in terms confirmed by that order, we have a right to presume, as no objection or exception thereto was taken by any party, that this collection, like the other, was approved by the court and the parties. If not approved, objection should have been made, and the money deposited to the credit of the court in the cause ought at once to have been returned, by an order of court, to the commissioner. But was retained by the court and parties where it was beyond the commissioner’s control, without the slightest intimation of dissatisfaction on the part of the court or parties until long after the fund had perished, without fault on the part of Dickinson. Under such circum *365 stances, we think, on the principles above declared, that it was error to charge Dickinson with the value of the money thus collected. Davis v. Harman, 21 Gratt., 194. And this decision, as to Dickinson must necessarily lead to a correction, also, of the decree as to Lowry.
The decree as to the appellant, Mead, must be reversed with costs in this court against all the appellees except Dickinson and Lowry; and as to the said appellees, Dickinson and Lowry, the decree must be corrected, as above indicated, and affirmed.
The decree was as follows:
This day came again the parties by counsel, and the court having maturely considered the transcript of the record and the arguments of counsel, is of opinion, for reasons stated in writing and filed with the record, that the Circuit court erred: 1st, insetting aside the order of the 4th day of October 1862 and the decree of the 28th day of April 1864, entered in the first of these causes, and in annulling the deed to the appellant Mead, and requiring him to file his bonds again in the cause, and ordering him to pay again the amount thereof, instead of dismissing the bill as to him; 2d. In holding the appellee, Dickinson, responsible for the gold value of the Confederate States treasury notes collected by him as commissioner of the court, and deposited in the Bed-ford Savings Bank to the credit of the first of these causes; 3d. In holding Lowry responsible, under the circumstances of the case, for that portion of the purchase money of the land purchased by him, which was paid by him to Commissioner Dickinson in Confederate States treasury notes and deposited by the latter in bank to the credit of the cause. That amount should, under all the circumstances of the case, have been credited to his purchase at fair value. It is therefore decreed and *366 ordered, that so much of the decree of the Circuit court of Bedford of the 3d of October 1868 as sets aside the order of the 4th of October 1862, and the decree of the 28th of April 3864, in the first of these causes, and annuls the deed made to Mead under said last mentioned decree, and requires him to file again, with the papers in the cause, the bonds executed by him to the commissioner of the court, and to pay in discharge thereof, within six months from the date of the decree, the sum of $11,485.96, with interest on $7,996.74, part thereof, from the 7th day of August 1868, and in default thereof that the land purchased by him be sold, be reversed and annulled, and that the appellees, except Dickinson and Lowry, do pay to the appellant his costs by him about the prosecution of his appeal to this court expended, such as are personal representatives to pay out of the assets of their testators or intestates. And this court, proceeding to enter such decree as the said Circuit court ought to have rendered, doth decree and order that the bill in the second of these causes be dismissed as to the defendant, Oliver G-. Mead, and that the plaintiffs in the Circuit court in that suit do pay to the said defendant, O. G. Mead, his costs by him about his defence in said suit expended, (such of the plaintiffs as are personal representatives to pay out of the assets of their testators or intestates).
And as to the residue of said decree of the 5th of October 1868, it is further decreed and ordered that the same be corrected and amended as to Dickinson, by crediting the amount of $918.86, decreed against him, by the sum of $512.05, as of the 1st of June 1868, being the aggregate of the values erroneously charged to Dickinson at that date for collections from Mead and Lowry; so as to leave a balance due from Dickinson, as of that date, of only $406.81, with interest from June *367 1, 1868; instead of $918.86, with like interest, as decreed against him; and that the same be further corrected and amended as to Lowry, so as to credit the decree against him for $1,967.05, by the sum of $1,096, paid on the 5th of January 1864, to H. C. Dickinson, commissioner, in Confederate States treasury notes, and deposited by the latter in bank to the credit of the first cause, as reported to the court by the petition and report of March 19, 1864; leaving a balance due on said decree against Lowry of $871.05, with interest from the 5th day of January 1864, till paid, instead of the sum of $1,967.05, as by said decree ascertained. And it is further ordered and decreed that so much of said decree of the 5th of October 1868 as is thus corrected and amended; and so much of the residue thereof as is not in conflict with this decree be affirmed.
Decree reversed.